**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| MONIQUE LANPHEAR, derivatively on behalf of DANAHER CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>RAINER M. BLAIR, FEROZ DEWAN, LINDA H. FILLER, EMMANUEL LIGNER, TERI LIST, WALTER G. LOHR, JR., MATTHEW R. MCGREW, JESSICA L. MEGA, MITCHELL P. RALES, STEVEN M. RALES, PARDIS C. SABETI, A. SHANE SANDERS, JOHN T. SCHWIETERS, ALAN G. SPOON, RAYMOND C. STEVENS, and ELIAS A. ZERHOUNI,<br><br>Defendants,<br><br>-and-<br><br>DANAHER CORPORATION,<br><br>Nominal Defendant. | **C.A. No.**<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Monique Lanphear ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively on behalf of Nominal Defendant Danaher Corporation ("Danaher" or the "Company"), brings this Verified Shareholder Derivative Complaint against Rainer M. Blair, Feroz Dewan, Linda H. Filler, Emmanuel Ligner, Teri List, Walter G. Lohr, Jr., Matthew R. McGrew, Jessica L. Mega, Mitchell P. Rales, Steven M. Rales, Pardis C. Sabeti, A. Shane Sanders, John T. Schwieters, Alan G. Spoon, Raymond C. Stevens, and Elias A. Zerhouni (collectively, the "Individual Defendants" and, together with Danaher, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Danaher with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought against certain Danaher officers and members of Danaher's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between April 21, 2022 and October 24, 2023 (the "Relevant Period"). Plaintiff seeks to recover damages sustained by the Company as a direct and foreseeable result of Defendants' misconduct and to implement governance reforms necessary to prevent recurrence.

2. Danaher is a global science and technology conglomerate comprised of more than twenty operating companies across biotechnology, life sciences, diagnostics, environmental and applied sectors. Beginning in 2015, Danaher significantly expanded its Life Sciences segment through major acquisitions, including Pall Corporation in August 2015 and General Electric Company's biopharmaceutical support business, later renamed "Cytiva," in March 2020.

3. The COVID-19 pandemic dramatically increased demand for the Company's diagnostic testing products and for bioprocessing equipment used by pharmaceutical companies developing vaccines and therapeutics. Danaher subsidiaries, including Integrated DNA Technologies, Cytiva, and Pall, experienced a surge in demand as governments, laboratories, and drug manufacturers raced to detect, treat, and prevent COVID-19.

4. By late 2021 and early 2022, however, it became increasingly clear that COVID-19 would transition from a pandemic to an endemic disease, reducing demand for COVID-related products and altering the dynamics of the biopharmaceutical market. At the same time, many of Danaher's largest customers had accumulated significant inventories of bioprocessing supplies during the pandemic and were reducing new orders while working through these stockpiles.

5. Despite these developments, the Individual Defendants repeatedly assured investors that Danaher's bioprocessing business would continue to deliver robust growth and that any decline in COVID-related demand would be offset by strength in the Company's non-COVID bioprocessing markets. In doing so, Defendants issued or authorized overly optimistic financial projections and guidance that lacked a reasonable basis and failed to account for weakening customer demand, inventory overhang, and tightening funding conditions across the biotechnology sector.

6. Over the course of 2022 and 2023, Danaher was forced to issue a series of downward revisions to its revenue guidance, progressively reducing projected COVID-related revenues and ultimately cutting base business growth expectations from high single digits to low single digits and, eventually, to declines. These partial disclosures triggered a series of significant stock price declines from $243.08 at close of business on October 20, 2022 to $192.65 at close of business on October 25, 2023 – a 20.7% collapse.

7. As a direct consequence of Defendants' misconduct, Danaher now faces substantial exposure and lasting reputational harm from a pending federal securities class action arising from the same course of conduct, captioned *Hawkins, et al., v. Danaher Corporation, et al*, Case No. 1:23-cv-02055-AHA (D. D.C.) (the "Securities Class Action"). In August 2025, the Court denied a motion to dismiss in the Securities Class Action, holding that the plaintiffs there had adequately

pled that defendants made materially false and misleading statements and found a strong inference of scienter. Following the Court's ruling, litigation in the Securities Class Action has progressed, increasing the likelihood the Company will incur significant liability, as well as substantial legal costs and harm to its reputation.

8. Compounding this harm, certain Individual Defendants sold over $18 million worth of Danaher stock while in possession of material nonpublic information concerning the Company's faltering bioprocessing business. By selling shares at prices artificially inflated by the Company's misleading statements and omissions, these insiders were unjustly enriched and breached their fiduciary duties of loyalty and good faith.

9. At the same time that certain Individual Defendants were offloading stock, the Board authorized Danaher to repurchase the Company's own shares. These buybacks deployed corporate funds to purchase stock at artificially inflated prices and further augmented market demand for Danaher shares, thus enabling insiders to unload their stock without materially depressing the market price, all at the Company's expense.

10. Defendants' conduct constitutes breaches of the fiduciary duties of loyalty, good faith, and due care. At a minimum, Defendants consciously disregarded known risks and red flags of demand normalization, inventory overhang, and funding constraints in the bioprocessing market. Alternatively, Defendants failed to implement and maintain adequate reporting and oversight systems necessary to ensure accurate public disclosures and reliable forecasting, in violation of their oversight obligations.

11. This action seeks to hold Defendants accountable for the harm they caused to Danaher, including recovery of damages, disgorgement of unjust enrichment, clawback of

improperly awarded compensation, and the implementation of meaningful governance reforms to strengthen Board-level oversight of forecasting, disclosure controls, and risk management.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 14(a) of the Exchange Act, 15 U.S.C. §§ 78j(b)and 78t, and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15. Venue is proper in the District of Delaware pursuant to 28 U.S.C. §§ 1391 and 1401 because Danaher is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

16. Plaintiff is a current Danaher shareholder and has continuously held Danaher stock at all relevant times.

### Nominal Defendant Danaher

17. **Nominal Defendant Danaher** is a Delaware corporation with principal executive offices at 2200 Pennsylvania Avenue, N.W., Suite 800W, Washington, DC. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DHR."

**The Individual Defendants**

18. **Defendant Rainer M. Blair ("Blair")** has served as Danaher's President and Chief Executive Officer ("CEO"), and as a member of the Board, since September 2020. Defendant Blair originally joined Danaher in 2010, holding various leadership roles before becoming Executive Vice President of Danaher's Life Sciences platform in 2017. Defendant Blair now serves as a member of the Board's Executive Committee, Finance Committee, and Science & Technology Committee. According to Danaher's most recent proxy statement from the Relevant Period, filed with the SEC on March 29, 2023 ("the 2023 Proxy"), Defendant Blair received $20,196,027 in total compensation from the Company in 2022, and beneficially owned 225,742 shares of Danaher's common stock as of the 2023 Proxy reporting date, March 1, 2023. Defendant Blair is named as a defendant in the Securities Class Action.

19. **Defendant Feroz Dewan ("Dewan")** has served as a member of Danaher's Board since 2022, and is currently a member of the Board's Finance Committee, Nominating & Governance Committee, and Science & Technology Committee. According to the 2023 Proxy, Defendant Dewan received $224,616 in compensation in 2022 as part of the non-management director compensation program and beneficially owned 1,076 shares of Danaher's common stock as of March 1, 2023.

20. **Defendant Linda Filler ("Filler")** has served as a member of Danaher's Board since 2005, and is currently Chair of the Board's Nominating & Governance Committee, and a member of the Board's Science & Technology Committee. According to the 2023 Proxy, Defendant Filler received $368,308 in compensation from the Company in 2022 and beneficially owned 54,344 shares of Danaher's common stock as of March 1, 2023.

21. **Defendant Emmanuel Ligner ("Ligner")** served as President and CEO of Cytiva prior to its acquisition by Danaher in March 2020, then as Vice President and Group Executive of

the Company's Biotechnology reporting segment after it was established in September 2022. Defendant Ligner ultimately stepped down from his roles at the Company in October 2023. Defendant Ligner is named as a defendant in the Securities Class Action.

22. **Defendant Teri List ("List")** has served as a member of Danaher's Board since 2011, and is currently Chair of the Board's Compensation Committee, and member of the Board's Audit Committee. According to the 2023 Proxy, Defendant List received $308,308 in compensation from the Company in 2022 and beneficially owned 31,664 shares of Danaher common stock as of March 1, 2023.

23. **Defendant Walter G. Lohr, Jr. ("Lohr")** served as a member of Danaher's Board from 1983 until his departure in May 2024. During the Relevant Period, Defendant Lohr served as a member of the Board's Compensation Committee, Finance Committee, and Nominating & Governance Committee. According to the 2023 Proxy, Defendant Lohr received $322,308 in compensation from the Company in 2022 and beneficially owned 452,727 shares of Danaher's common stock as of March 1, 2023.

24. **Defendant Matthew R. McGrew ("McGrew")** has served as Danaher's Executive Vice President and Chief Financial Officer ("CFO") since January 2019. According to the 2023 Proxy, Defendant McGrew received $7,183,344 in compensation from the Company in 2022 and beneficially owned 130,230 shares of Danaher's common stock as of March 1, 2023. Defendant McGrew is named as a defendant in the Securities Class Action.

25. **Defendant Jessica L. Mega ("Mega")** served as a member of Danaher's Board from 2019 until her departure in February 2026. During the Relevant Period, Defendant Mega served as a member of the Board's Compensation Committee and Science & Technology Committee. According to the 2023 Proxy, Defendant Mega received $308,308 in compensation

from the Company in 2022 and beneficially owned 4,805 shares of Danaher's common stock as of the 2023 Proxy reporting date.

26. **Defendant Mitchell P. Rales ("Mitchell Rales")** has served as a member of Danaher's Board since co-founding the Company with his brother, Defendant Steven Rales, in 1983. Defendant Mitchell Rales has also served as Chair of the Board's Executive Committee and Finance Committee since 1984, and as President of the Company from 1984 to 1990. According to the 2023 Proxy, Defendant Mitchell Rales beneficially owned 35,133,350 shares, or 4.8% of all outstanding Danaher common stock, as of March 1, 2023.

27. **Defendant Steven M. Rales ("Steven Rales")** has served as a member of Danaher's Board since co-founding the Company with Defendant Mitchell Rales in 1983, and as Chairman of the Board since 1984. Defendant Steven Rales also served as Danaher's CEO from 1984 to 1990. Defendant Steven Rales now also serves as a member of the Board's Executive Committee, Finance Committee, and Science & Technology Committee. According to the 2023 Proxy, Defendant Steven Rales beneficially owned 43,688,082 shares, or 6.0% of all outstanding Danaher common stock, as of March 1, 2023.

28. **Defendant Pardis C. Sabeti ("Sabeti")** served as a member of Danaher's Board from 2019 until her departure in December 2024. During the Relevant Period, Defendant Sabeti served as a member of the Board's Science & Technology Committee. According to the 2023 Proxy, Defendant Sabeti received $308,308 in compensation from the Company in 2022 and beneficially owned 6,434 shares of Danaher's common stock as of March 1, 2023.

29. **Defendant A. Shane Sanders ("Sanders")** has served as a member of Danaher's Board since 2021. Defendant Sanders is currently Chair of the Board's Audit Committee, and a member of the Board's Nominating & Governance Committee. According to the 2023 Proxy,

Defendant Sanders received $308,308 in compensation from the Company in 2022 and beneficially owned 2,890 shares of Danaher's common stock as of March 1, 2023.

30. **Defendant John T. Schwieters ("Schwieters")** has served as a member of Danaher's Board since 2003, and is currently a member of the Board's Audit Committee and the Board's Nominating & Governance Committee. According to the 2023 Proxy, Defendant Schwieters received $333,308 in compensation from the Company in 2022 and beneficially owned 57,828 shares of Danaher's common stock as of March 1, 2023.

31. **Defendant Alan G. Spoon ("Spoon")** has served as a member of the Board since 1999 and is currently a member of the Board's Compensation Committee. According to the 2023 Proxy, Defendant Spoon received $328,308 in compensation from the Company in 2022 and beneficially owned 100,473 shares of Danaher's common stock as of March 1, 2023.

32. **Defendant Raymond C. Stevens ("Stevens")** has served as a member of Danaher's Board since 2017, and is currently a member of the Board's Audit Committee and Science & Technology Committee. According to the 2023 Proxy, Defendant Stevens received $308,308 in compensation from the Company in 2022 and beneficially owned 16,798 shares of Danaher's common stock as of March 1, 2023.

33. **Defendant Elias A. Zerhouni ("Zerhouni")** has served as a member of the Board since 2009. Defendant Zerhouni currently serves as Chair of the Board's Science & Technology Committee, and is a member of the Board's Nominating & Governance Committee. According to the 2023 Proxy, Defendant Zerhouni received $328,208 in compensation from the Company in 2022 and beneficially owned 32,477 shares of Danaher's common stock as of March 1, 2023.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

34. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

35. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

36. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Danaher was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

37. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

## CORPORATE GOVERNANCE

### The Individual Defendants' Fiduciary Duties

38. By reason of their positions as officers, directors, and/or fiduciaries of Danaher and because of their ability to control the business and corporate affairs of Danaher, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Danaher in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Danaher and its shareholders.

39. Each director and officer of the Company owes to Danaher and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

40. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Danaher, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public

information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

41. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

42. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

**Danaher's Code of Conduct**

43. Danaher's Code of Conduct applies "everywhere we do business." Associates and, when they are acting on behalf of the Company, all Directors of Danaher are expected to comply with the formal requirements of the Code, applicable laws and regulations and Company policies.

44. In a section titled "Record Keeping and Financial Reporting," the Code of Conduct states:

> Investors, government officials and others rely on our accurate and honest books and records. Accurate information is also essential within the Company so that we can make informed business decisions.
> Associates with finance or accounting jobs or, jobs that affect product quality, have a special responsibility in this area, but all of us contribute to the process of recording business results and maintaining records. Each of us has a responsibility to ensure that the information we submit in all Danaher records is complete, accurate and understandable.
>
> To ensure that we can meet our responsibility to cooperate with audits, investigations and legal document requests, we must preserve records according to our policies, respond fully with all information requested and refrain from editing, modifying or deleting requested information.

45. In a section titled "External Communications" the Code of Conduct states:

Danaher strives to provide clear and accurate information to the media, financial analysts and the public. In addition to satisfying important legal requirements, this helps us maintain the trust of our shareholders, potential investors and government regulatory bodies. This, in turn, strengthens our corporate reputation. For these reasons, it is important that only designated associates speak publicly on behalf of Danaher.

- If you receive a call or request for information from a member of the media or a financial analyst, gather the relevant facts and consult with Danaher's Corporate Communications or Danaher's Investor Relations Department before responding.

- Never give the impression that you are speaking on behalf of Danaher in any communication that may become public if you are not specifically authorized to do so by an appropriate officer of Danaher Corporation.

- Obtain approval from Danaher's Corporate Communications Department before making public speeches, writing articles for professional journals, or engaging in other public communications when you are speaking on behalf of Danaher.

46. In a section titled "Fair Competition" the Code of Conduct states:

We believe in fair, free and open competition. We gain our competitive advantages through the quality of our products, rather than through unethical or illegal business practices.

Every country where we operate has laws that govern relationships with competitors, suppliers, distributors and customers. While the legal requirements vary, fair competition laws (also called antitrust, monopoly or competition laws) generally share the same objective— to ensure that markets operate efficiently by providing competitive prices, customer choice and innovation.

Industry and trade association meetings serve legitimate and worthwhile purposes. However, these meetings also carry risk because they bring together competitors who might discuss matters of mutual concern and potentially cross the line of what is permissible. Even joking about inappropriate topics, such as marketing or pricing strategies, could be misinterpreted and misreported.

If the conversation turns to any kind of anti-competitive discussion, you should refuse to discuss the matter, leave the conversation immediately and report what happened to the Legal Department.

47. In a section titled "Ethics and Compliance at Danaher" the Code of Conduct states:

> The Danaher Code of Conduct is endorsed by, and has the full support of the Danaher Board of Directors. The Danaher Board of Directors is responsible for overseeing ethics and compliance at Danaher.
>
> The Ethics and Compliance team, among other responsibilities, applies and interprets the Code, manages the intake and investigation of Speak Up! questions and concerns, develops and disseminates ethics and compliance trainings and communications, and assists with the design and implementation of preventative compliance measures.
>
> The Danaher Ethics and Compliance team is managed by the Chief Ethics and Compliance Officer who reports directly to the Danaher Corporation General Counsel. The General Counsel has direct access and reporting obligations to the Board of Directors and appropriate Board committee. In administering the Code, the Ethics and Compliance team works closely with other Corporate, Platform and Operating Company functions including Legal, Human Resources, Internal Audit, Finance and other groups focused on ensuring and monitoring compliance.

48. In a subsection titled "Protecting Inside information", the Code of Conduct provides the following, in relevant part:

> In the course of business, you may become aware of material, nonpublic information about Danaher or other publicly traded companies. Using this information for personal gain or sharing it with others is not only unfair to other investors, it is illegal.

- Never buy or sell any stocks, bonds, options or other securities of any public company, including Danaher, based on material, nonpublic information.
- Do not pass on material, nonpublic information to others (this is known as "tipping").
- Material, non-public information may include:
  - News of mergers, acquisitions or divestitures.
  - A planned offering or sale of the company's securities.
  - Major regulatory actions or major litigation concerning the company.
  - Significant changes in management.

- A major contract award or cancellation of an existing, major contract.
- Introduction of a material new product, technology or service, or material developments with respect to existing products, technologies or services.

49. The Individual Defendants violated the Code of Conduct when they conducted little, if any, oversight of Danaher's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and the aiding and abetting thereof.

50. Furthermore, Defendants Blair and McGrew violated the Code of Conduct by engaging in insider trading.

51. The Individual Defendants further violated the Code of Conduct by failing to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**<u>Danaher's Corporate Governance Guidelines</u>**

52. Danaher maintains publicly disclosed Corporate Governance Guidelines (the "Guidelines") which were adopted by the Board to promote effective corporate oversight and ensure accountability to shareholders. Those Guidelines expressly recognize that the Board is responsible for overseeing the Company's operations and management and exercising business judgment in the best interests of the Company and its shareholders. Specifically, the Guidelines state:

> The Board's responsibility is to provide direction and oversight. The Board establishes the strategic direction of the Company and oversees the performance of

> the Company's business and management. The management of the Company is responsible for presenting strategic plans to the Board for review and approval and for implementing the Company's strategic direction. In performing their duties, the primary responsibility of the directors is to exercise their business judgment in the best interests of the Company.

53. Consistent with these obligations, the Corporate Governance Guidelines further require directors to remain informed about the Company's operations and to review information provided by management to facilitate informed decision-making. The Guidelines emphasize that directors must carefully evaluate the materials presented to them in connection with Board meetings and other deliberations, providing:

> Management will be responsible for ensuring that, as a general rule absent exigent circumstances, Board members receive information prior to each Board meeting or committee meeting, as applicable, so that they have an opportunity to reflect properly on the matters to be considered at the meeting. Materials presented to Board members should provide the information needed for the Board members to make an informed judgment or engage in informed discussion. The Board welcomes attendance at Board meetings of senior officers of the Company.

54. Under the Guidelines, Danaher's Board has direct access to management and Company information in order to carry out its monitoring responsibilities. This access ensures that the Board is able to evaluate operational developments, financial performance, and emerging risks affecting the Company's business. As the Guidelines explain:

> "Board members have full access to senior management and to information about the Company's operations. Independent directors are encouraged to contact senior managers of the Company without senior corporate management present."

**Danaher's Audit Committee Charter**

55. Danaher also maintains an Audit Committee Charter (the "Charter"). In its Policy Statement, the Charter states:

> The purpose of the Audit Committee of the Board of Directors of Danaher Corporation is to assist the Board in overseeing (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the qualifications, performance and independence of the Company's independent auditors, and (4) the performance of the Company's

> internal audit function and independent auditors. The Committee shall prepare the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

56. In a section titled Other Committee Authority and Responsibilities, the Charter states, with respect to Financial Statements, Disclosure Matters and Controls & Procedures, that the Audit Committee is responsible for overseeing the integrity of Danaher's financial reporting and disclosure processes. Under its charter, the Committee is required to review and discuss with management and the Company's independent auditors the Company's annual and quarterly financial statements prior to their filing with the SEC, to recommend whether the audited financial statements should be included in the Company's annual Form 10-K, review significant accounting policies and judgments, evaluate the adequacy of the Company's internal control over financial reporting and disclosure controls, discuss audit findings and critical accounting matters with the independent auditors, and address major financial reporting issues, including off-balance-sheet arrangements and regulatory or accounting developments affecting the Company's financial statements.

## SUBSTANTIVE ALLEGATIONS

### Background

57. Danaher is a global science and technology conglomerate whose operating companies design, manufacture, and market professional, medical, industrial and commercial products and services worldwide. Danaher organizes its subsidiaries into three segments: biotechnology, life sciences, and diagnostics. In 2020, Danaher's life sciences and diagnostics segments were central to the Company's financial performance: together they accounted for about three quarters of Danaher's annual revenues.

58. Beginning in 2015, Danaher completed a series of transactions designed to grow its life sciences and diagnostics segments. In August 2015, Danaher Acquired Pall Corporation ("Pall"), a manufacturer of filtration, separation, and purification tools, for nearly $14 billion. In March 2020, Danaher acquired General Electric Company's biopharmaceutical support business, GE Life Sciences, for over $21 billion, and later rebranded it "Cytiva." During the Relevant Period, Pall and Cytiva anchored Danaher's life sciences and diagnostics segments.

59. The COVID-19 pandemic materially increased demand for the Company's diagnostic tests and related products. Danaher's diagnostics businesses were positioned to benefit from early testing demand, while the Company's life sciences platform supported customers developing and producing vaccines and therapies to prevent and treat COVID-19.

60. Throughout 2020 and 2021, as biopharmaceutical companies raced to develop and manufacture COVID-19 vaccines and therapeutics at speed and scale, Danaher's bioprocessing customers increased purchases of equipment, consumables, and services. Danaher's own description of this period reflects that Cytiva and Pall experienced a surge in demand tied to pandemic-driven development and production activities.

61. Pandemic-driven demand drove explosive growth for the Company: Danaher's revenues rose sharply from $18 billion in 2019 to $29 billion in 2021, virtually all of which was generated by the life sciences and diagnostics segments.

62. Bioprocessing became the single largest business within Danaher's life sciences segment and, after being separated from life sciences in September 2022, accounted for approximately $7.5 billion of the $8.5 billion in revenue generated by the newly formed Biotechnology reporting segment. In other words, the bioprocessing business represented more

than 88% of the Biotechnology segment and functioned, in practical terms, as one of Danaher's core reporting businesses.

63. Across Danaher's overall portfolio, bioprocessing generated roughly 25% of the Company's $31.47 billion in total sales in 2022. Excluding the Environmental & Applied Solutions segment, which Danaher planned to spin off in the fourth quarter of 2023, the bioprocessing business would have represented nearly 30% of the Company's sales.

64. Defendant Blair described the bioprocessing platform as a "$8.5 billion growth juggernaut" in biotechnology and told investors on January 24, 2023 that Danaher "anticipate[d] the size of our bioprocessing . . . businesses to increase meaningfully here in the coming years." The combined entity was so important to Danaher that it devoted its entire investor and analyst day in September 2022 to the bioprocessing business.

65. Danaher's market valuation rose with the growth of bioprocessing. During the pandemic period, Danaher's stock price increased from $121.39 per share in March 2020 to $329.01 per share in December 2021, reflecting investor expectations that Danaher's pandemic-era performance in the biotechnology, life sciences, and diagnostics segments would translate into sustained growth.

66. Against this backdrop, bioprocessing became critical to Danaher's market performance, and a critical area for Board and officer-level oversight. Danaher and senior management repeatedly emphasized the scale and performance of bioprocessing as a multi-billion dollar franchise with "high single digit to double digit" long-term growth outlook.

67. However, by early 2022, objective conditions began to signal that pandemic-era demand would normalize as COVID-19 evolved from an uncontrolled pandemic to a more predictable endemic illness. These early indicators made bioprocessing demand trends a

foreseeable and material risk area for Danaher. Because bioprocessing sat at the center of Danaher's financial performance, and because Danaher repeatedly highlighted that franchise to investors as a key growth center for the Company, the Board and senior officers had heightened oversight responsibilities to ensure that internal demand signals and forecast information were accurately incorporated into the Company's external communications and operational planning.

**The Individual Defendants Failed to Oversee or Disregarded Known Red Flags that Reflected Weakening Bioprocessing Demand**

68. Danaher's operating companies are unified under the Danaher Business System ("DBS"), which the Company describes as the framework governing its operational processes and corporate culture. DBS is designed to collect and analyze operational data across Danaher's businesses and to communicate those insights throughout the organization because Danaher's bioprocessing business relied on accurate forecasting for long-term customer demand, order pipelines, and production schedules.

69. One of DBS's core principles is "Customers Talk, We Listen," which emphasizes the systematic collection of customer feedback and operational data. As Defendant Blair explained on September 9, 2021, the purpose of this principle was to "deploy the voice of the customer back into the business with the certainty that it fuels continuous improvement or Kaizen." Consistent with that principle, Danaher executives repeatedly emphasized that the Company maintained constant dialogue with its customers and regularly incorporated those communications into its operational planning.

70. For example, Defendant Blair stated on March 8, 2022 that Danaher's business model relied on "constant dialogue" with customers and frequent engagement to ensure the Company understood customers' needs and production plans. Defendant Blair stated on April 21, 2022 that "we are very, very close to our customers, working together with them . . . to ensure that

we're able to not only meet their needs but also to ensure that we don't have inventory buildup in the system." Similarly, on October 20, 2022, Defendant Blair provided a similar message: "We have been, as a result of the pandemic, even closer than traditionally working with our customers to understand their production plans and to ensure that they are not overstocking at the expense of others who would need the product in what was a time of constraint here for the last, call it, 18, 20 months. . . . We do regular surveys with our customers."

71. In addition to these ongoing communications, Danaher conducted more comprehensive reviews with customers during the fourth quarter of each year. As Defendant Blair explained on November 30, 2022, the Company had "very intimate customer communication that we have where we literally work through what their inventory situation is, what kind of safety stocks they want to maintain, what they believe their production schedule is, so that all happens and it regularly happens in the fourth quarter as everybody starts dialing in their plans for the next year."

72. Danaher also gathered industry-wide intelligence regarding demand conditions in the biopharmaceutical sector. For example, Cytiva partnered with the research arm of the Financial Times to develop the Biopharma Resilience Index, a periodic empirical survey of biopharmaceutical executives that collected feedback across five key pillars, including supply chain resilience, talent pool, R&D ecosystem, manufacturing agility, and government policy and regulation. According to Cytiva, the results of the Index provide it with information to meaningfully assess industry needs on a global scale.

73. Through these formal and informal information channels, including customer engagement, internal demand forecasting, and industry surveys, the Individual Defendants professed to maintain detailed insight into the operational conditions affecting Danaher's

bioprocessing business. As Blair explained on July 21, 2022, Danaher was closely monitoring how customers "transition[ed] away from COVID-19 vaccines and therapies and into previously paused and new programs for other modalities."

74. Defendant McGrew later confirmed on July 25, 2023 that Danaher was "spending time with the customers in a pretty proactive way these days to understand what's on hand" and called out that "[s]ome are comfortable getting down where they were pre-pandemic, some are trying to get below that, and some are trying to be above that, actually."

75. By early 2022, the Individual Defendants were already receiving internal and market information through DBS and other internal reporting mechanisms that demand conditions created by the pandemic were beginning to reverse. Danaher's directors and officers were aware of these internal forecasts, which identified multiple forces that would pressure bioprocessing demand as the pandemic subsided.

76. First, the underlying driver of pandemic-era demand, large-scale development and production of COVID-19 vaccines and therapeutics, was declining as the public-health emergency transitioned into a more stable endemic environment. As COVID-19 became less widespread, demand for the equipment, consumables, and services used in pandemic-related programs naturally began to decrease. These changes directly affected the pipeline of projects supported by Danaher's bioprocessing businesses.

77. Second, Danaher's large pharmaceutical customers had accumulated significant inventory during the pandemic. Supply-chain disruptions and extended lead times had prompted many customers to place orders well in advance and stockpile critical bioprocessing components to ensure continuity of vaccine and therapeutic production. As supply chains normalized and production stabilized, those customers increasingly relied on these accumulated stockpiles rather

than placing new orders, creating a predictable reduction in demand for additional equipment and consumables.

78. Third, the financing environment for emerging biotechnology companies, another important segment of Danaher's customer base, was deteriorating. As funding became more difficult to obtain, many early-stage biotechnology firms reduced spending, delayed clinical programs, or canceled projects entirely. These developments further reduced the near-term demand outlook for bioprocessing equipment and services supplied by Cytiva and Pall.

79. These trends were not speculative or remote risks. To the contrary, Danaher's own internal data from DBS, including customer discussions, order activity, and demand forecasts reflected these developments in real time. The Company maintained ongoing communication with its major customers regarding production schedules, inventory levels, and program activity, providing management and the Board with detailed visibility into emerging shifts in purchasing behavior and order pipelines.

80. These demand signals were precisely the type of operational indicators that Danaher's Board was obligated to monitor. Given the central role of Cytiva and Pall in the Company's growth strategy and investor communications, oversight of demand conditions within the bioprocessing business was a core Board responsibility.

81. Despite receiving information reflecting these deteriorating conditions, the Board failed to take meaningful corrective action. The Individual Defendants did not ensure that the Company adjusted its internal forecasts or external messaging to reflect the mounting headwinds facing the bioprocessing business.

82. Nor did the Board implement additional controls or monitoring mechanisms to ensure that emerging demand risks were accurately incorporated into the Company's public

guidance and strategic planning. Instead, Defendants permitted the Company to continue projecting strong growth and durable demand within the bioprocessing franchise, even as internal indicators increasingly suggested that the pandemic-era surge was unsustainable.

83. In this manner, the Individual Defendants consciously disregarded a series of red flags indicating that demand conditions were deteriorating. Rather than exercise their fiduciary duty to ensure accurate reporting and responsible oversight of Danaher's mission-critical bioprocessing operations, Defendants allowed the Company to operate and communicate with investors based on assumptions that were increasingly inconsistent with the information available to them internally.

**False and Misleading Statements Issued During the Relevant Period**

84. The Relevant Period began on April 21, 2022, when the Company hosted an earnings call with analysts and investors to discuss financial results for the first quarter ended April 1, 2022. During that call, Defendant Blair received a question regarding whether customers had been "stockpiling" inventory in the Diagnostics segment or the bioprocessing business of the Life Sciences segment. Defendant Blair responded:

> Now if we switch gears briefly and go to the topic of stockpiling, we are very, very sensitive to this particular topic and stay extremely close with our customers. As an example, in the first quarter, Cepheid continued to be sold out. If you think about bioprocessing, this is an area where there continues to be in the industry manufacturing constraints. So we are very, very close to our customers, working together with them, with their manufacturing schedules to ensure that we're able to not only meet their needs but also to ensure that we don't have inventory buildup in the system. So could there be pockets of that? Perhaps on the margin, but generally speaking, we don't see a significant buildup in the supply chain.

85. During the same call, Defendant Blair received a question as to whether senior management was still "confident" that Danaher would achieve $2 billion in sales of equipment and services supporting the production of COVID-19 vaccines and therapeutics, to which Blair responded:

> Now if you look at our first quarter last year, our sales were up over 70%. And, so, if you look at the 2-year stack for Q1, we're in the 35% to 40% growth area, which we think is very robust and more than representative of what is going on in the market and think that that compares extremely well. In fact, we still think that we're taking share there. So that's sort of one marker that I want you to have. And then the second point is the order activity continues to be very, very strong. Last year, our orders in the first quarter were up over 90%. And, so, we anticipated that our orders in Q1 of this year would be down, but nonetheless, we continue to build backlog here in Q1 as well in the bioprocessing area. And this is why we're so confident in our core growth guide here for the year in bioprocessing of high single digit, low double digits between the robust growth that we're seeing and the backlog that we have, that's really important.

86. Defendant Blair went on to emphasize that growth in Danaher's non-COVID related bioprocessing business would account for falling COVID demand levels and continue to allow the Company to meet its annual target for bioprocessing:

> So now let's unpack that a little bit and think about what's going on and why COVID is sort of one variable, but that there are other variables here that are incredibly important and explain why we talk about the bioprocessing business and its growth in aggregate. So first of all, if you think about the activity levels outside of COVID in the bioprocessing business, it's important to see what's going on in clinical trials. And I've talked about this, but you know that the project pipeline for monoclonal antibodies is 50% larger today than it was 5 years ago. For cell and gene therapy, it's 10x larger, driving extraordinary activity here in the clinical trial area. And what you see, and as I mentioned in the opening comments, you see customers really starting to focus on these new projects across all modalities and not just allocating the resources to COVID but to these new modalities. So that's really important to note that customer activity level continues to be very, very high, and that plays through in the clinical trials. Now another point to take here is monoclonal antibodies are becoming the standard of care and the predominant class of biologic drugs. So what's going on in monoclonal antibodies is the primary growth driver in the market and also for our business
>
> And then you add to that that emerging markets and high-growth markets such as China and India are starting to have access to these monoclonal antibody treatments. That provides additional and significant volume leverage. At the same time, you have biosimilar growth, Vijay. So these biosimilars are leveraging the fact that some of the biologic drugs, monoclonal antibodies that are higher volume are starting to come off patent, and that's increasing the penetration of those drugs throughout the world where the penetration has been lower. And that's providing another growth impetus. And then lastly, and I'll stop with this now, we've been talking a lot about single-use technology and their adoption for a while, which is an additional leverage growth vector within the bioprocessing business. So all that helps the activity that we talked about provides for volume, but SUT [single use

> technology] on top of that is substituting more traditional technologies and is growing even faster. And we have well over $1 billion of single-use technology.
>
> So we feel very confident on the basis of what's going on outside of COVID. And that's why we look at it together because it's the aggregate that we look at and that really ultimately count that that will drive that high single-digit, low double-digit growth here for 2022 and also supports our high single-digit perspective beyond that.

87. Defendant Blair then restated the claim that non-COVID sales would make up for falling COVID-related bioprocessing sales:

> Really, the way we're thinking about that business is, again, in aggregate, and we do believe that both the underlying strength of the markets, as I just laid out, as well as the strength of our backlog, which continues to grow, support both the high single-digit, low double-digit bioprocessing guide for the year. And as you think about COVID within that, COVID's going to do what it does, but there is a larger market that is growing rapidly. And we're going to continue to see fluctuation as it relates to COVID volumes, whether there's a decision on booster shots for different age groups, whether it becomes part of an annualized immunization regimen. All of these are open questions. And our belief is that COVID is a part of our business, but there is another part of this business which is larger, it is growing at a faster rate and we are making investments to ensure that we capture the appropriate shares here. So, Dan, high single-digit, low double-digit bioprocessing growth for 2022.

88. Later on the call, Defendant Blair emphasized the strength of the business lines unrelated to COVID-19, stating:

> So, Luke, the way we're thinking about that is the strength of our underlying business, which I laid out here in some details, some clinical trials, mAbs, biosimilar volumes—keep in mind, it's the commercialized drugs that really drive volume here in this business—and, then, of course, that additional growth accelerator of the single-use technology adoption. Those are really the foundations that are driving the growth of this business. And the COVID business, it will do what it does, but that variation is within the realm of what we have been casting as the overall growth rate of the business. And so, you take the backlog, which continues to grow quarter-over-quarter, and you take the growth drivers that I've laid out, that is what supports the high single-digit, low double-digit growth for 2022 and the high single-digit longer-term growth guide that we've talked about.

89. On May 11, 2022, Blair presented at the 2022 Bank of America Healthcare Conference. Defendant Blair was asked to clarify the Company's COVID exposure in its outlook, to which Defendant Blair responded that the COVID business was expected to fall short of

previous expectations by approximately $500 million to $600 million. Again, Defendant Blair claimed that the shortfall would be made up for by the non-COVID business:

> Well, first of all, let's level set on what the guide is for the bioprocessing business here for the full year of 2022, which is high single, low double-digit growth. . . . But what is included in that guide and what is accounted for in that guide is that the COVID vaccine and therapeutic revenue could be down by $500 million to $600 million. So that's already included in that high single-digit, double-digit total bioprocessing business. And the way we make that happen is that the far larger parts of the non-COVID therapeutic and vaccine business is growing at mid-teens plus, and that is really what's driving the overall guide of high single digits, low double digits for 2022.

90. Defendant Blair then attributed this new forecast to recent customer developments:

> [W]e've seen some cancellations as customers will no longer pursue a COVID project, but in fact, they take the raw materials that they have acquired, and they apply those to the next project that they're working on. We see some delays where people say, "Look, my next project's starting up in 60 days instead of right away." So we see all of that, but we feel that, that would be accounted for in the $500 million to $600 million that we talked about.

91. Defendant Blair later received a question concerning the upside potential for the Company's long-term outlook of the Company's core revenue growth, to which Defendant Blair responded:

> Well, the plus really comes from the repositioning that I started off with. If you think about Danaher previously, we were a low to mid-single-digit kind of grower. I mentioned earlier the spins of Fortive, Envista and that we brought on many other companies, which I won't name again. And, then, even there, what we see is that Cytiva is growing faster than we had originally thought. We thought it was more like a 6% to 7% grower. Now we see it more firmly in the high single digits. And then, of course, molecular diagnostics used to be less than 5% of our business. Now it's over 10%. And so, what we're saying here, and we see this for the long term, we're trying to avoid rebasing our business with a different year or that sort of thing. We're just saying, look, this is a really robust portfolio. It is not a cyclical portfolio. It is well entrenched in attractive end markets. And we see the likelihood of being—growing faster than mid-single digits to be high.

92. As to whether Danaher was worried about funding in the biotech environment, Defendant Blair stated:

> So I don't worry much about that funding environment. And let me, again, piece that apart a little bit. First of all, when you do the analysis of the biotech sector and you look at the balance sheet of the great majority of the players, the average cash with—given the average burn rates is between 12 and 18 months. Sure, there's some at 6 months, and then there's others at 18 or 24, but let's just say the average is right around 18 months. And we think that that's quite significant and that will continue these innovators to keep driving towards hopefully lifesaving or certainly life-improving therapeutics. But I think when you step back for a second and you put biotech funding in relation to the bioprocess business, the most important thing to remember is that the bioprocess business is volume-driven. It is volume-driven. It's not the number of projects. It's the volume per project that makes a difference. And with that, that means that commercial drugs and drugs that are really in the Phase III volumes are the ones that drive this business. And the ones that are earlier stage, including those early-stage biotechs, have an impact but only at the margin. It is not a driver of the growth of the business. But from our perspective, this is not something that will have an impact here on the business in the short term.

93. On July 21, 2022, the Individual Defendants caused Danaher to issue a press release announcing its financial results for the second quarter ended July 1, 2022. In that press release, Defendant Blair is quoted as stating: "Danaher is comprised of high-quality franchises in attractive end markets with meaningful recurring revenues and durable business models. We believe the combination of our strong portfolio and talented team—all powered by the Danaher Business System—provides a strong foundation in today's dynamic operating environment and positions us well for the balance of 2022 and beyond."

94. Also on July 21, 2022, the Company hosted an earnings call with analysts and investors to discuss financial results for the second quarter. During that call, Defendant Blair stated that the Company maintained close contact with its bioprocessing customers to quell concerns about overstocking:

> In our bioprocessing business, we continue to see record activity levels from early-stage research to later-stage development and production which drove a combined core revenue growth rate of high single digits at Cytiva and Pall Biotech. Our backlog and our order levels remain very healthy, and as always we're working closely with customers to ensure they have the right inventory levels to support their planned activity.

95. Defendant Blair went on to disclose that Danaher now expected the bioprocessing business to earn only $1 billion in revenues for products and services related to COVID-19. Again, however, Defendant Blair reiterated that non-COVID revenues would compensate for the miss:

> We are seeing our customers continue the healthy transition away from COVID-19 vaccines and therapies and into previously paused and new programs for other modalities. As a result, we now expect COVID-19 vaccine and therapeutic revenue of approximately $1 billion in 2022 down from approximately $2 billion in 2021. Now, that said, there's no change to our high single to low double-digit core revenue growth outlook in our bioprocessing business for the year as customers are accelerating their investments across all other major therapeutic modalities.

96. Defendant Blair also claimed that activity levels in the end market for the bioprocessing business would provide a runway for very strong growth for years to come:

> The biologics market remains very healthy as evidenced by the increasing number of treatments in development and production. Today, there are over 1,500 monoclonal antibody-based therapies in development globally, which is up more than 50% from just 5 years ago. This is being driven by both novel molecules in development and the proliferation of biosimilars, which are helping to accelerate adoption in underserved markets as patents on higher-volume therapies expire. There are also over 2,000 cell and gene therapy candidates in development today, a more than tenfold increase over the last several years. And given this backdrop of such a significant and sustained increase in activity, we expect the growth rate in this market to remain very strong for many years to come.

97. Defendant Blair later received a question as to whether the growth rate for the bioprocessing products and services unrelated to COVID-19 were "sustainable" for 2023 and beyond, to which Defendant Blair responded:

> I think the way we see it is the following way. Let's level set on '22 here where, in the COVID business, we see revenues going from 2021 $2 billion to 2022 $1 billion. The non-COVID business, as you suggested, has accelerated here as customers are moving to non-COVID modalities and all sources of them, very broad-based. And, of course, on the margin, price ends up helping that as well. So we would expect certainly for '23 to continue to see elevated levels of non-COVID activity, probably above the low double digits that we have seen historically. Too early to say if it stays up over 20%, but certainly elevated in '23 versus what it's been historically.

98. As to the Company's bioprocessing business, Defendant Blair provided:

> Now, as we think about our 2023 guide—which I think is what a part of your question was trying to tease out—we feel good about our mid-single-digit plus positioning there where for the long term, which we have talked about in a number of occasions. And when you unpack that a little bit, we see bioprocessing to be up high single digits and that's consistent with what we've spoken of. And, as you look at bioprocessing, there, we continue to think that the non-COVID business is going to be growing very strong. You saw what we're doing here in the second half of the year with growth rates well over 20% in non-COVID. And then we've also derisked the discussion here relating COVID related therapeutics and vaccines. We see $1 billion of revenue in 2022. That's down from $2 billion in '21. And we probably say $500 million for 2023. So 2021 $2 billion, 2022 $1 billion, and 2023 $500 million for COVID-related vaccines. And, having said all that, we still see our biotechnology business growing at high single digits.

99. On the same call, an analyst asked for insight on whether Danaher has seen a shift in demand from its biotech customer segment within bioprocessing. Defendant Blair responded:

> Rachel, as you just suggested, the majority of these biotechs are either preclinical or in the very early stages of clinical. And it's really important to note that our business is driven by what's happening in Phase III and ultimately commercialized drugs. Over 75% of our business is in that later stage. And so, then, as you go upstream from that, that has less of an impact. Now, getting specifically to your point, we really haven't seen much of an impact of the biotech funding crunch here affecting the customer activity levels that we have. And, frankly, we do look at these biotechs and the proposals that they are pursuing whether there's proof of concept and data. And our sense is that the good projects and where the data is solid and convincing and proof of concept is given, they are continuing to attract funding. So we think that today's cash positions in the biotechs, the quality of the projects that they are pursuing, as well as the funding environment still providing funding to those that are able to provide data continues to be quite positive and is not impacting our business. Now, of course, to your longer-term question, we just have to see that the biotech area is a cauldron of innovation. So we, of course, longer term, will want to see that the funding continues to support that kind of innovation environment but today, are not concerned about what we see here for the next, call it, 18, 24 months.

100. On September 15, 2022, the Company hosted a live webcast for the annual investor and analyst meeting from Cytiva's North American headquarters in Marlborough, Massachusetts. On that call, Defendant Blair reminded listeners that the bioprocessing business boasted a high single digit long-term outlook:

> So we think that our growth rerates higher for the long term. Then you say, well, why do you think that? Well, let's have a look at the left here, where you see Cytiva

> and Pall together representing a $7.5 billion bioprocessing franchise growing high single digits for the long term. . . .

101. Defendant Ligner, then head of the Biotechnology group, mirrored Defendant Blair's statements:

> Cytiva was a transformational addition to the life science platform. Pall Life Science is also very similar to Cytiva, a leader in filtration and in single-use technology with extreme talent, expert in material science, and leading around membranes and filtration technology. . . . We're taking those 2 outstanding companies and putting them together. We're creating an undisputed leaders in the bioprocessing, $8.5 billion of revenue, anticipating long-term performance of high single digits.

102. Later in the call, Defendant Ligner reiterated:

> Today, our bioprocessing business is $7.5 billion, of which a single-use technology is in excess of $1 billion, and we really anticipate a long-term growth rate of high single digit. Cytiva and Pall together is an incredible offering to the customer and, therefore, in an incredible position. We are so much stronger together, and this is why we are doing it.

103. Defendant Ligner went on to summarize his statements during the presentation:

> I'm going just to very quickly wrap up and summarize before we move to our Q&A session. We're creating and absolutely leaders in the bioprocessing industry. Pall and Cytiva, together, it is a stronger offering for our customers. . . . So the Biotechnology group is now a leader across all modalities, including monoclonal antibody, cell and gene therapy, and mRNA. We have a strong secular driver in biologics, which creates significant long-term growth opportunity and the long-term projection of high single digit, uniquely positioned for the most comprehensive offering best-in-class services, support, and scale: scale of manufacturing, scale of talent, scale of commercial, scale of organic, and the ability with the Danaher Business System to continuously improve our service to customers.

104. In response to a request for more detail on the sustainability of the high single digit growth rate for the bioprocessing business, Defendant Blair added:

> First of all, it's very clear that we're coming with a tailwind that is based on COVID therapeutics as well as vaccines. And, as those wane, and we have called that out pretty clearly, right: $2 billion in 2021, $1 billion here in 2022, and we'd expect $500 million or so in 2023. At the same time, we have the non-COVID applications growing at very fast rates, and we've talked about those being in the mid-teens plus here. And that's what we're currently seeing, and that's what our order book shows

> here going forward. And when we come to the high single digits, it's once again a perspective that is not tied to any single year in the dynamics of any single year, but to say, this is the kind of very positive scaled market growth that we see.

105. On October 20, 2022, the Company issued a press release announcing financial results for the third quarter ended September 30, 2022. That release quoted Defendant Blair as stating: "Our growth was broad-based across all three segments, a testament to the durability and attractive end-market positioning of the franchises that comprise Danaher. As we look ahead we believe the strength of our portfolio combined with our talented team and the power of the Danaher Business System provides a strong foundation to continue delivering meaningful shareholder value through 2022 and beyond."

106. That same day, the Company hosted an earnings call with analysts and investors to discuss third quarter 2022 results, during which certain of the Individual Defendants advised that the Company expected the bioprocessing business to only generate $800 million in COVID-related sales in 2022, and deliver high single digit growth for 2022. In response to an analyst question concerning any changes to the previously-reported outlook, Defendant Blair confirmed, stating:

> [A]s we think about the bioprocessing business for 2023, we still think that there is room for $500 million of COVID opportunity in order to support the needs of the population, the variance, to replenish expired sell-by dates and all the things that you can think about. But, of course, that's a number that we watch very closely. More importantly, we think that the non-COVID business, which, of course, will again proportionately be a much larger part of the business will continue to be very robust. Funding levels are there, the number of modalities that continue to grow in the pipeline is broad. Our own project activity in early, mid and late stage is very strong. So we do not have a different view on 2023 for bioprocessing today.

107. As to the impact on bioprocessing inventory stockpiling on the Company's 2023 financial outlook, Defendant Blair stated:

> We have been, as a result of the pandemic, even closer than traditionally working with our customers to understand their production plans and to ensure that they are not overstocking at the expense of others who would need the product in what was a time of constraint here for the last, call it, 18, 20 months. So, as a result of that, we feel as though we are well positioned to understand the inventory situation. We

> do regular surveys with our customers. And, as a result of that, we don't believe that there is a general overstocking in the market. Having said that, we do think there are pockets where inventories are high. And those are based on customers ultimately changing their production plans, in other words, canceling orders specifically for COVID. And, so, the large COVID players whether that be for vaccine production or whether that be for therapeutics production, they have larger inventories, and those will likely exceed 6 months of inventory. But I think it's important to note that those large players have many programs, and they're able to redeploy that inventory So we are confident that the strength of this market and its fundamentals remain very, very strong.

108. Responding to an analyst's question on the non-COVID order book in bioprocessing, Defendant Blair admitted:

> So, for Q3, our orders are down over 20%, as expected. And I think that's a number which bears some commentary and context. First of all, we're coming off of order comps that are well in excess of 50% in the prior year And I think something that is perhaps not as well-known and that bears some conversation is we and many others have meaningfully reduced our lead time. And that's a pretty significant impact on the order placement cadence of our customers. So just to mention an example here, if lead times go from 52 weeks, which has been the case in some product categories in the marketplace, to 12 weeks, customers fundamentally change their order patterns. To give you a sense of that, if a customer wanted to order over time 4 bioreactors, they would order all 4 bioreactors at once if there's a 52-week lead time. But if it's a 12-week lead time, they would order 1 bioreactor and then follow up with other orders in the future. So what we're seeing right now is really the normalization of the marketplace coming from a red-hot pandemic fueled time of constraint, as long lead time for orders ramped up significantly. So order rates ramped up significantly to the supply chain now normalizing and customers adjusting their order cadence. So the orders were negative, to repeat, but not unexpectedly and to be seen in the context of a market that is now readjusting.

109. On November 30, 2022, Defendant Blair offered the following during a presentation at the Evercore HealthCONx Conference: "Now as we look forward here to sort of 2023 and beyond, our portfolio and our DBS base ability to out execute is unique. And when you couple that with our 75% recurring revenue that's supported by attractive really low cyclical end markets, I think that speaks really well for what's to come." Regarding the bioprocessing business in 2023, Defendant Blair noted:

> [A]s we think about, looking forward, the range of outcomes looks something like this. The revenue for 2023 non-COVID could be in the mid-teens. That's

> representative of what the 3-year CAGR has been. It's been mid- to high-teens, so it could be mid- to high-teens. It could also be what it's been sort of the last year, which is well over 25%, as you suggested in your question, certainly, that could be one outcome. Or perhaps it just settles back into the high single-digit, low double-digit longer-term growth rate that we've spoken about. Now I think our view is that while that's the total range, it's probably more likely that it is between the high-single digit and mid-teen range, but there is that number out there of well over 20%. But somewhere in between that range is how we see 2023 playing out.

110. As to Danaher's previously announced 2023 projections for the bioprocessing business, Defendant Blair stated:

> So as we've said pretty consistently that as you look at the broader marketplace, we really don't see an enormous amount of stocking going on. In fact, it wasn't until very recently that we got out of the hand-to-mouth sort of supply situation with the constraints that occurred in the supply chain through the pandemic-related demands. Now having said that, and I think I've been clear here that there are pockets where there has been some inventory buildup and they tend to be related to customers who had larger COVID-related programs, whether that's a vaccine or whether that's a therapeutic, they've either not had the kind of demand drawdown that they expected because the vaccination rate is lower or the variance made a particular therapeutic no longer relevant or because they've canceled the program entirely. So you have sort of the full gamut of potential there. But those are really just pockets with larger players who are quite well positioned to draw that down. And so how does that make us think about 2023? Well, we've already said, look, for 2023, we think our COVID demand goes from the $800 million I just spoke of to the $500 million, right? So you see the manifestation of what I just spoke of sort of these pockets in that change there, and that's what we're currently expecting for COVID in 2023.

111. Defendant Blair then received a question as to whether the Company's $500 million COVID-related revenue outlook was "aggressive" or based on "visibility" in the order book for 2023. Defendant Blair responded:

> That's currently the status that we have with our customers, the $500 million. And I think our customers regularly review vaccination rates, new approvals that they get around the world in various countries. And so that's what we think that's our expectation for '23.

112. On January 24, 2023, the Company issued a press release announcing financial results for the fourth quarter and year ended December 31, 2022 and projecting Danaher's sales growth in 2023.

113. In a section titled, "Forecasted Core Sales Growth and Base Business Core Sales Growth," the press release compared the change in various growth metrics between the 2023 fiscal year and a "[c]omparable 2022 [p]eriod." According to the press release "[c]ore sales growth (non-GAAP)" had declined by "[m]id-single digit[s]," "[i]mpact of COVID-19 related testing, vaccines and therapeutics" increased by "[l]ow-double digit[s]," and "[b]ase business core sales growth (non-GAAP)" increased by "[h]igh-single digits[s]."

114. The press release went on to add: "Starting with the first quarter 2023, the Company will revise its definition of base business core growth to exclude revenues related to COVID-19 testing, vaccines and therapeutics, in addition to the exclusion of currency translation, acquisitions and divested product lines. For the full year 2023, the Company anticipates non-GAAP base business core revenue to be up high-single digits."

115. On January 24, 2023, the Company also hosted an earnings call with analysts and investors to discuss financial results for the fourth quarter and full year ended December 31, 2022. During the call, Defendant Blair again discussed the 2023 projections for Danaher's bioprocessing business:

> Looking to 2023, we expect customers to further reduce their COVID-19-related programs. Vaccination and booster rates have been significantly lower than initially anticipated, and the availability of alternative therapeutics has reduced the need for monoclonal antibody-based treatments. In light of these dynamics, we now anticipate COVID-19-related vaccine and therapeutic revenue will be approximately $150 million for the full year of 2023, down from approximately $800 million in 2022 and lower than our previous expectation of $500 million. Our non-COVID business has averaged more than 20% growth over the past 2 years. Given these elevated growth rates, we spent the past several weeks speaking with our customers to better understand their planning assumptions for 2023. And, based on these discussions, we anticipate non-COVID bioprocessing core growth will be high single digits for the full year 2023. This includes low single-digit core growth in the first quarter as customers repurpose inventory purchased for COVID-19 vaccine and therapeutic programs to non-COVID projects.

116. As to Danaher's overall 2023 guidance, Defendant Blair stated:

> So with that color on what we're seeing in our business and end markets, let's now look ahead to our expectations for the first quarter and the full year. [F]or the full year 2023, we expect high single-digit core growth in our base business. And we also expect total core revenue growth to decline mid-single digits for the year as a result of lower demand for COVID-19 testing, vaccines and therapeutics.

117. Responding to an analyst's question concerning stocking dynamics, Defendant Blair provided:

> Derik, as it relates to the inventory situation, let's think about sort of our Q1 guide here as a starting point and the context for that. We expect for our overall guide to have a base business growth of mid-single digits. And we expect COVID testing, including now vaccine and therapeutics, to have high single-digit and low double-digit headwind, giving us that [core sales] decline of mid-single digits in the first quarter. Now let me come back to the base business because, of course, that's where your question resides. And, once more, we have to be clear that we have now excluded vaccine and therapeutic revenues from the base business, right? So our mid-single-digit base business is down from the comparable low double-digit core growth we saw in Q4 and most of 2022. And that's due mainly to bioprocessing ex COVID Now if we look and we dig in a little bit deeper into bioprocessing, we anticipate that our non-COVID bioprocessing business will be low single digits. And that's really for two reasons. One, we're coming off of 30% growth in Q1 of 2022. But we're also working through the inventory pockets that we spoke about that were related primarily to COVID programs. And we do expect Q1 to be an inflection point there that we work through the majority of that in Q1 and then after that, continue to see improvement.

118. Then, in response to an analyst's request to clarify the non-COVID order book in bioprocessing, Defendant Blair admitted that orders were down by mid-teens in the fourth quarter 2022, but assured that this was a result of the market readjustment:

> Now from a current trend perspective, in the fourth quarter, our order rate improved by over 500 basis points sequentially but was still down mid-teens, which was as expected as customers continued to adjust for our shorter lead times.

119. As to the overall trend in bioprocessing for non-COVID sales, Defendant Blair stated:

> Now, to be clear, our full year 2023 guide anticipates Q1 being the low point at low single digits for the bioprocessing non-COVID core growth. And that also takes account to any inventories that might be with some of our COVID program customers, which are now being repurposed. We're working with those customers

> to repurpose that inventory. So whatever these order dynamics, our revenue forecast for bioprocessing non-COVID in the first quarter is low single digits. We expect that to be the low point of the inventory work-off or burn-off and then move forward to what is high single-digit bioprocessing non-COVID core growth for the full year.

120. Defendant Blair later confirmed that Danaher still expected its bioprocessing business to generate high single digit sales growth overall in 2023:

> [W]e did talk about the bioprocessing growth range being from high single digits to mid-teens range. And, as I mentioned then, and I'll confirm now, we have spent the last several weeks talking to our customers to understand their planning assumptions for the year. And the clear message is the underlying demand remains robust and unchanged. So we continue to see monoclonal antibodies, cell therapy and gene therapy activity continue to be strong. And we're even seeing more work on mRNA on the back of its success with COVID vaccines. So while the demand is remaining solid, customers are actually not anticipating a step-up in activity. So activity remains strong and, as we've seen in prior quarters, but they're not anticipating a step-up versus what we've seen here in the last couple of years. And, so, as you look at the 2, 3, even 4-year stacks here, we've seen mid-teens growth CAGRs [compound annual growth rate] for bioprocessing non-COVID. So, coming back then, if you take our high single-digit bioprocessing non-COVID full year guide on the back of an approximately 30% comp from 2022, it fits right in the mid-teens range, both on a 2- and a 3-year basis.

121. Defendant Blair then reiterated that Danaher was confident that Q3 and Q4 2023 would make up for anemic sales in first half of the year for bioprocessing:

> So as we think about burning off these inventories, you asked about the confidence in the later part of the year. And that confidence is based on our discussions with customers, the backlog that we have, the continued order activity that we see and that has improved over prior periods. And, so, we feel very good about the high single digits non-COVID bioprocessing growth for 2023.

122. Defendant Blair then concluded the call by assuring that, "[f]or 2023, we see our base business growing at high single digits" across the Company as a whole.

123. On March 29, 2023, Defendants Blair, Dewan, Filler, List, Lohr, Mega, Mitchell Rales, Steven Rales, Sabeti, Sanders, Schwieters, Spoon, Stevens and Zerhouni caused Danaher to file with the 2023 Proxy that contained material misstatements and omissions.

124. The 2023 Proxy incorporated by reference Danaher's Code of Conduct, Corporate Governance Guidelines, and each of the Board Committee Charters. At the same time, it called for Company shareholders to elect Defendants Blair, Dewan, Filler, List, Lohr, Mega, Mitchell Rales, Steven Rales, Sabeti, Sanders, Schwieters, Spoon, Stevens and Zerhouni to the Board.

125. The 2023 Proxy was false and misleading because it failed to disclose: (1) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (2) customers had stockpiled inventory in the aftermath of the pandemic and were relying on those items to satisfy new projects instead of placing new orders; (3) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (4) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the foregoing downturn in business in 2022 and would continue to decline in 2023; and (5) accordingly, Danaher would be unable to sustain its growth in 2022 and 2023.

126. As a result of false and misleading statements in the 2023 Proxy, Company shareholders reelected Defendants Blair, Dewan, Filler, List, Lohr, Mega, Mitchell Rales, Steven Rales, Sabeti, Sanders, Schwieters, Spoon, Stevens and Zerhouni to the Board, allowing them to continue to breach their fiduciary duties to the Company.

127. On April 25, 2023, the Company issued a press release announcing financial results for the first quarter ended March 31, 2023, revising its sales growth outlook for 2023. Specifically, the press release compared the change in various growth metrics between the 2023 fiscal year and a "[c]omparable 2022 [p]eriod." According to the press release "[c]ore sales (decline) growth (non-GAAP)" had declined by "[h]igh-single digit[s]," "[i]mpact of COVID-19 related testing, vaccines

and therapeutics" increased by "[l]ow-double digit[s]," and "[b]ase business core sales growth (non-GAAP)" increased by "[m]id-single digits[s]." The press release further stated: "For the second quarter and full year 2023, the Company anticipates that non-GAAP base business core revenue will be up mid-single digits year-over-year."

128. On April 25, 2023, Danaher also hosted an earnings call with analysts and investors discussing financial results for the first quarter ended March 31, 2023. On that call, Defendant Blair stated that Danaher was forced to lower its outlook for the bioprocessing business based on recent conversations with customers:

> Reported revenue in our Biotechnology segment declined 16% and core revenue was down 13%. In bioprocessing, base business core revenue growth was in line with our expectations of low single digits in the first quarter. [D]emand at our large customers, who were primarily responsible for therapies in commercial production and later-stage clinical trials, remains robust and they're steadily working through inventory they built during the pandemic. Based on our most recent customer conversations, we now expect the inventory normalization process to continue through the second half of the year. During the quarter, we also saw softer demand globally at many of our emerging biotech customers as more pronounced pressures on liquidity and funding accelerated their efforts to conserve capital leading to project delays and cancellations. In consideration of these factors, we anticipate second quarter and full year base business core growth in bioprocessing will be largely consistent with the first quarter.

129. Regarding bioprocessing, Defendant Blair represented:

> Now turning to the full year 2023. Despite the near-term and temporary challenges within bioprocessing, we anticipate mid-single digit core growth in our base business. We also expect total core revenue to decline high single digits for the year as a result of lower demand for COVID-19 testing, vaccines and therapeutics.

130. Later, an analyst requested clarity on Danaher's bioprocessing performance in China for the quarter, as well as the trend moving forward. Defendant Blair indicated that the market would recover in Q3 and Q4 of the year:

> Well, as it relates to bioprocessing in China, we've had a very good and strong business there in China for years. And helped quite significantly in China in order to build the capacity for vaccines and for other biologics. And what we see today, much like we've seen in the U.S., is that the emerging biotech segment, which is

> an important part of China's efforts to build a local biopharma industry, is also impacted by capital constraints. So we've seen that play out in China as well. And, in fact, that's what is the primary impact on our China numbers here. Now, as it relates to the full year in China, we expect our full year in China to be up low single digits for Danaher overall based on the market recovery, exiting COVID as well as, if you will, a normalization of the activity level in bioprocessing.

131. At the 2023 Bank of America Healthcare Conference on May 10, 2023, Defendant Blair supported the Company's recent guidance adjustment while responding to a question for the Company's "latest guide" on bioprocessing:

> So going forward, for the rest of the year, we really are expecting the same type of activity level as we saw in Q1. And that's what we're seeing in the bioprocessing business. We continue to see that. We were 1% in the first quarter, so call it flat, and that's essentially what we're saying for the remainder of the year, expecting no change in that dynamic as the market works through these various points.

132. On July 25, 2023, the Company issued a press release announcing financial results for the second quarter ended June 30, 2023, again revising its sales growth outlook for 2023. That press release compared the change in various growth metrics between the 2023 fiscal year and a "[c]omparable 2022 [p]eriod." According to the press release "[c]ore sales (decline) growth (non-GAAP)" declined to a range of "[h]igh-single digit[s] to low-double digit[s]," "[i]mpact of COVID-19 related testing, vaccines and therapeutics" increased by "[l]ow-double digit[s]," and "[b]ase business core sales growth (decline) (non-GAAP)" increased by "[l]ow-single digits[s]." The press release further added: "For the full year 2023, the Company anticipates that non-GAAP base business core revenue growth will be up low-single digits year-over-year."

133. On July 25, 2023, Danaher also hosted an earnings call with analysts and investors to discuss financial results for the second quarter ended June 30, 2023. There, Defendant Blair reiterated the new guidance, stating:

> Now turning to the full year 2023. Due to near-term challenges within bioprocessing, we now anticipate low-single digit core revenue growth in our base business. We also expect total core revenue to decline high single to low double

> digits for the year as a result of lower demand for COVID-19 testing, vaccines, and therapeutics.

134. Defendant Blair went on to assure investors that Danaher was working with its large pharmaceutical customers to destock their inventory levels:

> So let's start with orders. In the first half of the year, our orders were essentially down 20%. And as we look forward here to the second half of the year, we think that our orders will be down modestly. That's a combination of various factors. One being that our large customers, CDMOs, continue to work through inventories. . . . And, then, we are actively managing inventories down. While that is not new, we've intensified our efforts there really in order to get as much as possible of the stocking topic behind us here in 2023.

135. Defendant provided similar assurances in response to a question asking him to quantify the amount of destocking, stating:

> I mean, I could probably come up with some numbers, but it would be imprecise. . . . I mean we don't really spend a lot of time trying to figure out how much was destocking as much as spending time with the customers in a pretty proactive way these days to understand what's on hand, what's the real need that you've got site by site by site so that we can help them manage down to an inventory level they are comfortable with. So I don't know that I've got a great answer for a number, but we are actively managing it in probably a way that was more active than we have been.

136. On the same call, Defendant Blair also added:

> We talked about the various puts and takes of the destocking that I think you correctly summarized with pharma and emerging biotech. You see the China piece that we're flagging here. And, then, of course, actively managing those inventories with our customers here in order to get as much as possible behind us in 2023. And we think 2023 probably is the bottom.

137. The statements detailed above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis as they ignored ongoing customer activity and market conditions that posed a significant threat to the continued growth of Danaher's bioprocessing business. Specifically, the Individual Defendants failed to disclose that: (1) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as

customers pursued other projects as COVID-19 entered an endemic state; (2) customers had stockpiled inventory in the aftermath of the pandemic and were relying on those items to satisfy new projects instead of placing new orders; (3) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (4) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the foregoing downturn in business in 2022 and would continue to decline in 2023; and (5) accordingly, Danaher would be unable to sustain its growth in 2022 and 2023.

138. The truth of Defendants' misconduct emerged via a series of partial disclosures. On May 11, 2022, following the Company's earnings call held on April 21, 2022, Defendant Blair revealed for the first time that annual revenue in Danaher's bioprocessing business for products and services supporting the production of COVID-19 vaccines and therapeutics was expected to be $1.4 billion to $1.5 billion in 2022, down from previous estimates of $2 billion.

139. Despite this partial correction, the Company continued to mislead investors by assuring that the miss would be made up for by growth in the non-COVID arm of the bioprocessing business. Specifically, Defendant Blair stated: "And the way we make that happen is that the far larger parts of the non-COVID therapeutic and vaccine business is growing at mid-teens plus, and that is really what's driving the overall guide of high single digits, low double digits for 2022."

140. On July 21, 2022, Defendant Blair admitted that Danaher expected the bioprocessing business to earn only $1 billion for COVID-related vaccines and therapeutics in 2022, but continued to mislead investors by emphasizing that "there's no change to our high single to low double-digit core revenue growth outlook in our bioprocessing business for the year [2022] as customers are accelerating their investments across all other major therapeutic modalities."

141. On October 20, 2022, Defendant Blair advised that the Company expected the bioprocessing business to only generate $800 million in COVID-related sales in 2022, and deliver high single digit growth for 2022, down from the high single digit to low double digit growth previously communicated. On this news, the Company's stock price fell nearly 6%, to close at $243.08 on October 20, 2022.

142. On January 24, 2023, Danaher announced that it expected core sales to decline by mid-single digits in 2023, as a result of "lower demand for COVID-19 testing, vaccines and therapeutics." The Company also announced that it only expected to grow base business core sales by high single digits in 2023. The Company continued to mislead investors, however, by downplaying the extent of the demand slump. On this news, the Company's stock price fell 5.2% over the next two days, closing at $262.95 on January 25, 2023.

143. On April 25, 2023, Defendants Blair and McGrew admitted that there was a slowdown in the base bioprocessing business, and that the Company now expected its base business core sales to only grow by mid-single digits in 2023, down from high single digits. On this news, Danaher's stock price fell over 9%, from $254.35 at the close of trading on April 24, 2023 to $231.99 at the close of trading on April 25, 2023.

144. On July 25, 2023, Danaher again revised its annual outlook, cutting base business core sales growth from mid-single digits to low-single digits, resulting in a core sales decline of high single digits to low double-digits, up from a decline of high-single digits. Blair revealed that the cut to Danaher's base business core sales guidance was attributable to "near-term challenges within bioprocessing," including, in particular, "the funding environment and the stocking situation in China." Blair further admitted that the Company needed "a more frequent touch point

pattern . . . with our customers in order to ensure that we keep our finger on the pulse of what's going on there."

145. On October 24, 2023, Danaher revealed that it had cut its full year outlook yet again, increasing the core sales decline to a firm low double-digit range and inverting modest growth in the base business to a low single digit decline. Defendant Blair confirmed that "customers are still working through inventory built up during the pandemic[.]" Defendant Blair later added: "And bioprocessing was as expected, and we don't believe that changes here either. So, we do believe that we're at the bottom here in 2023 in bioprocessing." On this news, Danaher's stock price dropped nearly 5.6% over the following two days, to close at $192.65 on October 25, 2023.

## DAMAGES TO THE COMPANY

146. As a direct and proximate result of the Individual Defendants' actions, Danaher has lost and expended and will continue to lose and expend many millions of dollars.

147. Such expenditures also include, but are not limited to, the fees associated with the Securities Class Action, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto. Given the fact that the Securities Class Action defendants' motion to dismiss was denied, Danaher now faces the prospect of significant monetary liability, as well as ongoing legal fees and costs associated with defending or resolving that litigation and any related regulatory investigations. These exposures have already necessitated the engagement of outside counsel and consultants to support both litigation and internal risk assessments.

148. At the same time, key executives and members of the Board of Directors continued to receive lucrative compensation packages. These included base salaries, incentive bonuses, stock awards, and other benefits, despite their role in misleading investors and impairing the Company's

financial position. These payouts represent a waste of corporate assets and a failure of compensation oversight by the Board.

149. The Company has also incurred reputational damage in the eyes of the investing public. Beginning on January 24, 2023, Danaher's stock declined sharply and analysts downgraded the Company. The following disclosures undermined investor confidence, impaired the Company's market valuation, and weakened its ability to raise capital, attract strategic partners, and retain key talent.

150. As a direct and proximate result of the Defendants' conduct, Danaher has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future.

**Repurchases During the Relevant Period**

151. During the Relevant Period, Danaher maintained a share Repurchase Program which is reviewed by Danaher management, subject to annual approval by the Board. The Repurchase Program authorized Danaher to repurchase up to 20 million shares of the Company's common stock from time to time on the open market or in privately negotiated transactions.

152. Under the Repurchase Program, the Individual Defendants caused Danaher to spend at least $1 million to repurchase approximately 3,906 shares of its own common stock at artificially inflated prices from July 2022 through August 2022.

153. According to Danaher's Form 10-Q, filed with the SEC on October 20, 2022 for the quarterly period ended September 30, 2022, the Company reported that it repurchased 3,906 shares of its common stock for approximately $1,069,619, at an average price of $273.84 per share.

154. At the of the repurchase time, Danaher's stock was instead worth only $192.65 per share. Danaher therefore overpaid by approximately $317,128.10 for repurchases of its own stock,

further augmenting market demand at the Company's expense. In total, Danaher overpaid for repurchases of its own stock by over $317,128.10 during the Relevant Period.

**While in Possession of Material Non-Public Information, Defendants Blair and McGrew Unjustly Enriched Themselves**

155. Between approximately August 2022 and February 2023, Defendants Blair and McGrew misappropriated corporate information for their substantial benefit by selling their stock at inflated prices.

156. At all relevant times, Danaher had an insider trading policy stating that all non-public information about the Company should be considered confidential information and, as a result, the use of non-public information for personal financial benefit was prohibited.

157. During the Relevant Period, Defendant Blair was Danaher's President and Chief Executive Officer and thus possessed a sophisticated understanding of the Company's business operations and sales practices. As set forth herein, Defendant Blair possessed material nonpublic information that he knew was being concealed from investors. Defendant Blair consciously acted to exploit non-public information by selling over $12 million in Danaher stock for his substantial benefit, as set forth below:

| Date | Number of Shares | Average Price | Gross Proceeds |
|---|---|---|---|
| 2/24/23 | 2,028 | $249.12 | $505.215.40 |
| 2/1/23 | 5,976 | $267.50 | $1,598,580.00 |
| 8/15/22 | 25,000 | $300.00 | $7,500,000.00 |

158. Each of the sales set forth in the chart above were made at times calculated to maximize Defendant Blair's gain. Each such sale was made soon after the Individual Defendants issued false and misleading statements about the Company's bioprocessing division. Documents filed with the SEC claim that the August 15, 2022 sale was made pursuant to a trading plan established under SEC Rule 10b5-1, but there is no prior reference to any such plan for Blair in

his SEC filings or otherwise. It is therefore reasonable to infer that the Rule 10b5-1 plan was entered into during the Relevant Period. Any sales made to satisfy tax obligations upon the distribution or exercise of other shares do not minimize the suspicious nature of the sales, because fewer shares need to be sold to cover such liabilities when the stock price is inflated.

159. During the Relevant Period, Defendant McGrew was Danaher's Executive Vice President and Chief Financial Officer and thus possessed a sophisticated understanding of the Company's business operations and sales practices. As set forth herein, Defendant McGrew possessed material nonpublic information that he knew was being concealed from investors. Defendant McGrew consciously acted to exploit his non-public information by selling over $5 million in Danaher stock for his substantial benefit, as set forth below:

| Date | Number of Shares | Average Price | Gross Proceeds |
|---|---|---|---|
| 2/24/23 | 625 | $249.12 | $155,700.00 |
| 11/11/22 | 11,213 | $274.96 | $3,083,160.12 |
| 11/11/22 | 7,722 | $274.37 | $2,118,685.14 |

160. Each of the sales set forth in the chart above were made at times calculated to maximize Defendant McGrew's gain. Each such sale was made soon after the Individual Defendants issued false and misleading statements about the Company's bioprocessing division.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

161. Plaintiff brings this action derivatively in the right of and for the benefit of Danaher to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

162. Danaher is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

163. Plaintiff is an owner of Danaher stock and has been a continuous shareholder of Company stock at all relevant times.

164. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

165. The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

166. The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

167. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

168. On December 18, 2025, Plaintiff, through Plaintiff's counsel, sent a demand on Danaher's Board to investigate the violations of law described herein and to pursue litigation against the Individual Defendants for breaching their fiduciary duties by allowing Danaher to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as Exhibit A.

169. The Demand outlined alleged misstatements made during the Relevant Period, detailed therein, that the Individual Defendants "failed to disclose that: (1) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially

decline as customers pursued other projects as COVID-19 entered an endemic state; (2) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (3) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (4) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the foregoing downturn in business in 2022 and would continue to decline in 2023; and (5) accordingly, Danaher would be unable to sustain its growth in 2022 and 2023."

170. On February 18, 2026, Plaintiff received an email on behalf of the Board (the "Demand Refusal"). The Demand Refusal stated that the Board had concluded that resolution of Plaintiff's demand would be premature and instead chose to "defer consideration of the demand pending resolution of the related proceedings and investigations." The Demand Refusal is attached hereto as Exhibit B.

171. At the time the Board refused the Demand, the Board consisted of the following individuals: Defendants Blair; Dewan; Filler; List; Mitchell Rales; Steven Rales; Sanders; Schwieters; Spoon; Stevens; and Zerhouni (the "Director Defendants"). The Board also consisted of non-party director Charles W. Lamanna.

172. The Board wrongfully refused Plaintiff's Demand and has failed to take any action to correct the breaches of fiduciary duty alleged in the Demand.

173. The Demand Refusal does not contain a written report or other writing setting forth the reasoning for deferring consideration of the Demand. In failing to produce a report or other writing, the Board neglected to allow Plaintiff and the Court to assess the reasonableness of its methodology in deciding to defer consideration of the Demand.

174. The Board's decision-making to date is therefore not consistent with its obligation to determine in good faith whether the Demand's claims have merit and whether it would be in the Company's best interest to pursue them. Given this lack of good faith, the Board's deferral of consideration of the Demand constitutes a constructive refusal of the Demand.

175. The Board did not act independently, nor reasonably, nor in good faith, on the basis of all reasonably available information by plainly disregarding the merits of the claims and allegations in the Demand.

176. For the foregoing reasons, the Board's refusal of the Demand falls outside of the protections of the business judgment rule. Plaintiff is therefore permitted to proceed and to prosecute this action derivatively on behalf of Danaher.

## CLAIM ONE

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

177. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Danaher. Not only is Danaher now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Danaher by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase its own shares at artificially inflated prices, damaging Danaher.

179. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce

and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

180. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Danaher not misleading.

181. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Danaher.

182. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

183. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or

director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

184. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

185. Plaintiff on behalf of Danaher has no adequate remedy at law.

**CLAIM TWO**

**Against Defendants Blair, Dewan, Filler, List, Lohr, Mega, Mitchell Rales, Steven Rales, Sabeti, Sanders, Schwieters, Spoon, Stevens and Zerhouni for Violations of Section 14(a) of the Exchange Act**

186. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

187. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. As alleged above, the Company's proxy statement filed on March 29, 2023 violated § 14(a) and Rule 14a-9 because it failed to disclose Danaher's faltering bioprocessing business.

188. In the exercise of reasonable care, Defendants should have known that the statements contained in the proxy statement were materially false and misleading.

189. The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The proxy statement solicited stockholder votes for: (i) director election; (ii) ratification of the independent accounting firm; and (iii)

executive compensation. The proxy statement was an essential link in the accomplishment of the continuation of the Individual Defendants' violation of their fiduciary duties.

190. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy.

191. Plaintiff on behalf of Danaher has no adequate remedy at law.

**CLAIM THREE**

**Against the Individual Defendants for Breach of Fiduciary Duties**

192. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Danaher's business and affairs

194. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

195. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Danaher.

196. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

197. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the foregoing false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

198. The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had

actual knowledge that the Company's internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

199. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

200. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Danaher has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

201. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

## **CLAIM FOUR**

### **Against the Individual Defendants for Waste of Corporate Assets**

202. Plaintiff incorporates by reference and realleges each and every re-allegation set forth above, as though fully set forth herein.

203. As a direct result of their wrongdoing herein, Defendants have wasted Danaher's valuable corporate assets by, among other things, causing Danaher to pay excessive and improper compensation, fees, and salaries to Defendants who breached their fiduciary duties and by causing the Company to incur millions of dollars of legal liability or legal costs to defend Defendants' unlawful actions and to lose financing from investors and business from future customers who no longer trust Danaher and its products. As a result of the waste of corporate assets as alleged herein, Defendants damaged Danaher and as such are liable to Danaher for corporate waste.

204. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

## CLAIM FIVE

## Against Defendants Blair, McGrew, and Ligner for Contribution Under Section 21D of the Exchange Act

205. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

206. The conduct of Defendants Blair, McGrew, and Ligner as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

207. Danaher and Defendants Blair, McGrew, and Ligner are named as defendants in the related Securities Class Actions that allege and assert claims arising under the federal securities laws. Danaher is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

208. If Danaher is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Blair, McGrew, and Ligner as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. Danaher is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

209. As officers and directors, Defendants Blair, McGrew, and Ligner had the power or ability to, and did, control or influence, either directly or indirectly, Danaher's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

210. The Individual Defendants are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

211. Defendants Blair, McGrew, and Ligner have damaged the Company and are liable to the Company for contribution.

212. As such, Danaher is entitled to receive all appropriate contribution or indemnification from Defendants Blair, McGrew, and Ligner.

**CLAIM SIX**

**Against Defendants Blair and McGrew for Breach of Fiduciary Duty (*Brophy*)**

213. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

214. Defendants Blair and McGrew are fiduciaries of Danaher, possessed material non-public information ("MNPI") of Danaher, and used that information improperly to profit from a sale of Danaher stock. When Defendants Blair and McGrew directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the MNPI they possessed.

215. When Defendants Blair and McGrew sold their stock, they knew that the investing public was unaware of the negative MNPI that they possessed. They also knew that if the information was disclosed, the market price of Danaher would be significantly lower. Defendants Blair and McGrew timed their stock sales to take advantage of the public's ignorance of the concealed facts and obtain a higher price for the stock they sold. They thereby benefited by misappropriating Danaher's MNPI.

216. No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

**CLAIM SEVEN**

**Against the Individual Defendants for Unjust Enrichment**

217. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218. Through the wrongful course of conduct and actions complained of herein, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, Danaher.

219. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Danaher that was tied to the performance or artificially inflated valuation of Danaher, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

220. Plaintiff, as a stockholder of Danaher, seeks restitution from the Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Defendants, from their wrongful course of conduct.

221. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

**CLAIM EIGHT**

**Against the Individual Defendants for Gross Mismanagement**

222. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

223. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Danaher in a manner consistent with the operations of a publicly held corporation.

224. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Danaher has sustained and will continue to sustain significant damages.

225. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## CLAIM NINE

## Against the Individual Defendants for Abuse of Control

226. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Danaher, for which they are legally responsible.

228. As a direct and proximate result of the Individual Defendants' abuse of control, Danaher has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Danaher has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

229. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all defendants as follows:

A. Declaring that Defendants have breached their fiduciary duties to Danaher and committed other violations of state and federal law, including, but not limited to, corporate waste;

B. Declaring that Plaintiff may maintain this action on behalf of Danaher and that Plaintiff is an adequate representative of the Company;

C. Determining that this action is a proper derivative action maintainable under law;

D. Determining and awarding to Danaher the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

E. Directing Danaher to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with Danaher's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

F. Awarding Danaher damages including, without limitation, punitive damages, together with pre-and post-judgment interest to the Company;

G. Providing extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of Danaher, has an effective remedy;

H. Awarding Danaher restitution from Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

I. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J. Granting such other and further relief as this Court deems just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 13, 2026

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Fax: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Liaison Counsel for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10118
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*